Case No. 20-5302, TikTok Inc. and ByteDance Ltd. v. Donald J. Trump, official capacity as President of the United States et al. appellant. Mr. Byron for the appellant, Ms. Brinkman for the appellate. Good morning. Good morning, Your Honor. May it please the Court, Thomas Byron from the Department of Justice, here for the government defendants who are appellants in this case. The district court's injunction here misunderstands the scope of AYIPA's exceptions in Section 1702B and plaintiff's interpretation of the language in that provision concerning indirectly regulating or prohibiting conduct would have no limits at all and is directly contrary to this court's Walsh v. Brady. In that case, this court rejected a similarly broad argument that a substantial burden on importation of informational materials would be a prohibited indirect regulation of that conduct. The district court's preliminary injunction here can't be squared with that of the, I'm sorry, regulation of the mobile app's availability on an app store, which is the only prohibition at issue here, is not the equivalent of regulating directly or indirectly the activity of users on that app or the platform it serves. Here, the prohibitions imposed by the Secretary of Commerce and the President regulate only the commercial transactions that make a particular mobile app available within the United States. They do not target in any way the conduct, the protected activity of the users on the TikTok platform who are able to import and export information or informational materials or exchange personal communications using either that platform, for example, on a web browser or other platforms that are also available to them. The fact that the activity of the users is unconstrained by the commercial prohibition at issue here is dispositive. It's not enough that there might be an incidental effect, as the plaintiffs argue, that might... I don't argue incidental effect. They argue indirect regulation, and it seems to me, at least me personally, that deciding what indirect regulation of informational materials means is critical to this case. And WASH seems less helpful because that was a ban on travel, and it just happened in that instance to affect someone who wanted to travel to import, but that was sort of a one-off or unusual consequence of the regulation. Lots of travel wasn't going to be to import informational materials. But here, we have a, for purposes of this stage, a prohibition on people joining an informational community that TikTok has created. And so, all the time, it's not going to be one-off that it affects people's speech. On the other hand, as you have argued, TikTok is quite clear that they are just a platform, and at least have not argued here, that their own speech is at stake. And so, I'm trying to figure out what the government's definition, not of incidental, but of indirect regulation is. What would be an indirect regulation of speech? And if you can give me an example in the social media concept environment, that would be most helpful. Sure, Judge Millett. So, let me start, if I may, by going back to WASH itself, which made clear that it was an indirect regulation of importing posters from Cuba when the government required any payment for those posters to be put in a blocked account and prevented the seller from accessing it. That was what this court identified there as concerned about. So, translating that to this context is obviously going to be imperfect. Congress had nothing like this in mind, obviously, as plaintiff's brief itself points out. We would say, however, that there are examples of indirect regulation that effectively prohibit all importation or exportation of informational materials, and that's what would make them like the blocked account example in WASH. So, for example, you could imagine a prohibition imposed by the government. It would obviously be a direct regulation, just to start there, Your Honor, if the government said no importation or exportation of videos to China. That would be the kind of direct regulation prohibited by 1702B. It would be an indirect regulation, for example, if the government said not to users, importers or exporters, Americans, but instead to all internet service providers, ISPs. If the government said to every ISP operating in the United States, you must prohibit the transmission of any video to a Chinese IP address. That, it seems to me, would be an indirect regulation. But what's going on here is quite different because it's a regulation instead of a particular platform leaving available alternatives. So, just as in WASH, where the plaintiff wanted to travel. It's not just a platform. Let's just assume, think of this point just so I understand your indirect example. Let's assume that what the government were regulating was the number one platform for importing or exporting videos between China and the United States. Let's assume we're dealing with that platform whenever we want to. Platform Q. And it is responsible for 85% of all imported and exported videos from China. And the government said that platform is shut down. Would that be an indirect regulation at that point because of the volume? No, Judge Millett, it wouldn't. And the reason is because the, by engaging in a business that permits Americans to undertake protected activity, a company or a foreign government doesn't insulate itself from regulation concerning national security. In other words... My hypothetical were 100%. That's an important answer, Judge Millett. If, well, let me back up for a moment and well, you know, transports that allows the interchange of information, but go ahead. So Judge Millett, I think the same answer, if alternative means remain available. So I think that the question then becomes, is there a practical imposition of what amounts to a prohibition? That's what the court in WASH said effectively, I think, was true of the blocked account requirement that was an indirect regulation there. But it's not enough that a particular preferred method of importing or exporting informational materials might be burdened. That's what the court said in WASH. The plaintiff there wanted to try... With that method, a lot depends on what you mean by alternatives. If you have, if the alternatives to my platform Q, which we'll say for entertainment purposes is 95% of the interchange between China and the United States of videos, and it's 95% because platform Q is incredibly good and it has all these kinds of features and allows people to form communities and to join videos and communications in a way that the other platforms, which are all grainy and have very poor editing techniques, do not. And so there's alternatives in that sense, but they simply do not allow the same type of interchange and intercommunication that platform Q does. So just one, first of all, I think it's hard to measure those kinds of comparative qualities, but here I think the answer is revealed in the plaintiff's own evidence. I'm just trying really to understand your legal definition of indirect. Are you saying that if the other alternatives are just really not that good and don't, yes, you can exchange videos, but you can't have the same type of communications and interchanges and quality of speech, and it's an enormous percentage, 95, pick it at whatever height number you want, 95%. That would be indirect regulation, but we don't have to worry about it here because the facts are different, or that would not be indirect regulation regardless of the facts. So first of all, Judge Moy, it would not be indirect regulation because it wouldn't prohibit effectively. But your alternatives there really are not allowing the same type of speech. Well, and that's why I think the first part of your proposed distinction is relevant as well, and that's what I was getting at, if I may just continue to answer your question. With the fact that the plaintiffs here put in evidence in support of their request for a preliminary injunction, demonstrating that there really were effective alternatives and that that was their business concern was that users would migrate to those alternative platforms and wouldn't come back to this one even if it were later made available. So you're saying that the comparability of the alternatives does or does not matter to indirect regulation? So I think it might matter, Judge Millett, in some circumstances, but that question is- What is the legal test? We have to articulate a test, and I just, I don't see anything as helpful maybe as you do in Walsh. What would you say in an indirect regulation? So I think the language of Walsh is relevant, Judge Millett. It says, until 1988, regulation nominally allowed the importation, but in reality banned it by requiring that the importers make payment in debauchous accounts. So if in reality it would be a ban, then that would be an indirect regulation by the language of this court's decision. So perhaps, Judge Millett- I'm sorry, go ahead. No, I guess what I was trying to get at is that to the extent we're the lesson of Walsh and the scope of the precedent that this court has decided, if you're asking would a ban on what is a far better means be an indirect ban, in reality a ban in the language of this court? I think that's potentially a hard question, but one that you need not answer here because the plaintiff's own evidence demonstrates that it's not true. But to an extent far better than does factor into your definition, even if it's not a total ban. Not our definition, Your Honor. I'm trying to answer your hypothetical. In other words, I think in reality banned is the definition this court has offered, and the question then becomes, well, is it in reality a ban if there is a preferred alternative that really is so much better? I don't know the answer to that. In effect, ban means that whatever was regulated was just a facade, and that this really is direct regulation by another name. That seems a fairly narrow definition of indirect regulation. Well, in reality banned is what the court said, and I think that's a meaning- it gives meaning to indirectly regulate, Your Honor. So a de facto ban. Yes, I think that's what the court was getting at. Anything short of that. You're telling me I don't need to decide it in this case, and it sounds like the test is de facto ban plus something else, but you don't need to decide it in this case. But other times it sounds to me like you're saying the government's position is de facto ban, and that's what I'm trying to sort out right now. Is it de facto ban, or is it de facto ban plus? It's de facto ban, Judge Millett. Okay, so it doesn't matter about the fact of this case. I think it doesn't matter. To the extent that you might be concerned about a harder case where you think it might matter, that's what I don't think this court needs to decide in the context of the preliminary injunction. This one bans by forbidding new users from joining. This prohibition bans a lot of Americans from joining the communications and exchanges that I think more than a quarter of in those communications. They're banned once they can no longer download the app. How are they not banned? Judge Millett, they're not banned for two reasons. First of all, the president's executive order and the secretary's decision memo make clear that the particular most significant risk here is from the mobile app itself, not from the platform as a whole, and that other means of accessing the platform remain available. So, for example, a web browser can access the TikTok platform without posing the same national security risks. Similarly, a- Do you have to sign away licenses and they don't give up their personal data if they go in through their web browser? It depends, Judge Millett. So, the record here does not investigate in great depth, but it is true that one can use a web browser without establishing an account on TikTok, and establishing an account is where much of that personally identifiable information is. Is this in your brief or is this in the record somewhere? No, it's not, and that's what I said a moment ago. The record here does not identify those details, but what it does identify- Is this in your brief that they can go in through the web browser, that that is allowed? I believe we did mention that, Your Honor. All right. So, they can't set up an account? They don't- Well, Your Honor, I don't think we addressed that question, but you asked and I'm trying to answer. You cannot set up an account that way, or you can get in without setting up an account? That is my understanding, Judge Millett, and if that's relevant to the court's determination, we can certainly address that in a supplement. But can you set up an account if you go in through a web browser? Yes, Judge Millett, I believe you could. And you would have the exact same concerns? Not the exact same concerns, no, Judge Millett. So, for example, the geolocation data associated with a cell phone or other mobile device is a vast array of sensitive personal information at stake here. Similarly, collecting clipboard data, which is available and has been done from mobile devices, is not demonstrated to be true elsewhere. So, and I'll just point to the Supreme Court's decision in Carpenter to emphasize that geolocation privacy concern that might not be present in other means. Is that the national security? I mean, that did not seem to be the chief national security concern. It is part of it, Judge Millett. So, it's mentioned in the Secretary's decision memo, and I can find the page for you if you'd like. The fact is there is a wide swath of data that's permitting the Chinese government and the Communist Party of China to collect information on Americans and compile vast databases that pose a threat to the security of the economy of the United States. If these same videos were getting shipped back and forth between the United States, exact same videos on CDs instead of on this app, you would agree you can ban that, right? Correct, Judge Millett, we are not banning the sending of the videos. Aren't you then, because the statute says regardless, informational materials regardless of medium, and what you're doing is you're taking those exact same videos, and because they're not on CDs, but they're instead on this medium, the TikTok mobile app, because of the medium, you say you can ban them. That's what I'm having, that's another thing I'm having trouble with. Right, Judge Millett, but I'll point out that the concern here is related to how the TikTok mobile app collects information about users. The language at 1702b3, if you agree that these same people, users, could, if you wanted to go back to my old antiquated era, could exchange these things back and forth, these videos on CDs, but what bothers the United States is the medium of transmission, use of a mobile app rather than a CD, it's banned, and that seems to be a problem because the B3 says you cannot prohibit the import or export of informational materials, which I'm going to assume you agree that these videos are, regardless of the medium of transmission, it seems to me you're making a difference based on the medium of transmission, whether it's CDs, whether it's through a web browser, or through a mobile app. How is that not distinguishing the same materials on the basis of the medium of transmission? So it does regulate the medium of transmission, Judge Millett. I'm sorry, go ahead. Well, no, I think that's essential because I think by including that additional language in the provision in 1702b3, Congress recognized that there may be, that there is a difference between regulating the transmission of the materials on the one hand and regulating the medium on the other hand, and it is the transmission, I'm sorry, not the transmission, it's the importation or exportation of those informational materials that Congress sought to protect, and so it may be, Judge Millett, in a particular circumstance, I'm going to offer a crazy hypothetical, if it were demonstrated that fingerprints would always be present on a CD, and that the collection of those fingerprints by a foreign adversary, a foreign government, posed a threat to national security, that perhaps it would be permissible to by another medium of transmission. It would not be, in reality, a ban of the importation or exportation, as the court said in Walsh, to do so. So the distinction between user activity on the app and regulation of the app itself is the key distinction here that we think demonstrates this is not an indirect regulation of user activity. Well, let me just ask you then, what do you understand the sub three paragraph addressing? Because it is following the does not phrase. In other words, I thought in your brief you were arguing in part that all you're seeking to do is to regulate in one form or another business-to-business transaction. You're going to sell a company, that type of thing, not affecting me and how I get information or what medium I use to get that information. Judge Rogers, I take it you're asking about 1702B3, the exception not in IHPA for importation or exportation of information or informational materials. Do I understand that correctly? That's what we've been talking about for the last five minutes. Yes, that's right, Judge Rogers. And so I think that the distinction I just was that regulating the business of the TikTok mobile app is distinct from regulating the conduct and protected activity of users on that platform. So whereas a user can still send videos using other means, the government is free to prohibit the business activities that support the mobile app that poses a national security risk. That's the key distinction, Your Honor. Even given the language, I'm just trying to understand what Congress had in mind when it wrote this language. It's saying the president can't do this. Correct, Your Honor. But what it says the president can't do is regulate or prohibit directly or indirectly importation or exportation of information or informational materials. And Walsh says that it's a regulation indirectly if it's in reality a ban on the importation or exportation. That's a far greater standard, a higher standard, than merely regulation of a preferred method of importing or exporting informational materials. So just as the plaintiff in Walsh wanted to travel because that was the preferred method he wanted to negotiate the importation of Cuban posters, just because users here want to use the mobile app as a means to send their videos doesn't mean that it's an indirect regulation by the government of sending videos to prohibit the mobile app from operating in this country. I know you say it, but Congress wrote this language that seems to just fly in the face of that. But I don't think Walsh can control here. Judge Rogers, I think Walsh does control. And let me offer another perspective on it. It doesn't control in the sense that the holding is on all fours with the issue that's here. There may be language in it that you're using to elaborate on your reasoning, but that's different. Judge Rogers, I don't think it's just that. The holding in Walsh specifically rejected the kind of broad interpretation of indirectly regulate that the plaintiffs here have offered and the district court relied on. In that sense, we think it is controlling and that the district court's injunction cannot be squared with this court's decision. The plaintiff in Walsh said that anything that is a substantial burden on importation or exportation of informational materials is indirect regulation. This court's holding rejected that argument. The plaintiffs here argue anything that prevents the use of a particular preferred platform or burdens the use of that platform is an indirect regulation. That is inconsistent with Walsh's holding, Judge Rogers. And we would just emphasize that there's nothing to indicate that's wrong. I just wanted to follow up on, if there were no other apps that allowed video sharing like this, the only other way to share videos would be by mailing CDs back and forth or tapes back and forth between the United States and China. Would that count as an alternative? Yes, Judge Millett, it absolutely would. So, if you banned every video sharing app, and for security reasons, you have the same security concerns, this is my hypothetical, every video sharing app that uses the internet, they're all banned so that people are back to snail mail CDs if they can buy them. I'm assuming they can, so it's an alternative. That would not be an indirect regulation of speech in the government's view. It would not be a ban in reality of importing or exporting. It would not be an indirect regulation of speech, of informational materials being exported or imported. That's right, Your Honor. But I would also emphasize, Judge Millett, that the language adopted in the second amendment in 1994, the Free Trade and Ideas Act, did identify a broadening of 1702b3, and it did so in a way that recognized that intangible informational material was also protected. But that intangible informational material is the video. It's not the means of transmission on a particular platform or in a particular medium. That's why it's important that Congress nevertheless maintained that regardless of format or medium of transmission, distinguishing between the information that a user seeks to import or export on the one hand, and the means that they seek to do so on the other. As long as it's not in reality a ban on the import or export, it's not an indirect regulation of that activity. The language also talks about regulate indirectly, too. We've been talking a lot about prohibitions and bans. So what's an example of an indirect regulation? Your Honor, I think that, for example, we spoke earlier about the hypothetical I suggested where because the government cannot directly prohibit something, it can't require a private company to prohibit something either if it's an altogether sweeping prohibition leaving no alternatives. So similarly, if the government can't regulate by – I'm having trouble imagining what the kinds of regulations we might have are, but let's say requiring registration of every video sent to China. That might be a regulation one might imagine requiring every user to register with government. So that would be a direct regulation. It can't require every ISP, using the example we spoke of earlier, to maintain a list of every user's video sent or received to or from China. I could imagine that being an example of indirect regulation. But here the key, too, is that it would regulate all imports and exports of the informational materials, not just a particular method or platform that some users might prefer. And that's the key distinction that we are emphasizing. And the reason this is important, Judge Millett, is that direct regulation of conduct that threatens our national security merely by engaging in a business or offering a platform that American users might prefer to use in some circumstances to export or import information. That would be a significant undermining. It would, as this And that's what the plaintiffs are urging, and we would ask this court to reject it. Before you leave us, are you bringing deference, Chevron deference, or something like it to your interpretation? Because the most I got out of your brief was, speaking of indirect, backing into, here's a case where that court decided government's interpretation gets deference. But I never heard you say the government claims deference. We're not seeking deference with respect to anything in the Commerce Secretary's decision, Judge Millett, but I will point out that we have cited, for example, to a Treasury Department OFAC regulation that has been, and those regulations have been recognized by this court and others, Third Circuit, Second Circuit, I believe, as worthy of Chevron deference, and we've pointed to that as an example of Is that the regulation that says it doesn't apply to materials that were not in existence at the time? That's right, Judge Millett, yes. Your position, and that's, I'm trying to figure out how that fits onto this. So that's, that's even if the videos already existed at the time, someone doesn't get to sign up for TikTok because they say, I only want to ship out, I only want to communicate with videos that are things I've already made. So I couldn't figure out what the connection was. So Judge Millett, the key here is that every time a user uploads a video onto TikTok, it creates a new and unique communication, and in that respect, it is subject to that distinction. That's not something we're emphasizing. You asked about Chevron deference, and I was merely pointing out that that's an example where there has been Chevron deference that we did point to. We are not asking for Chevron deference with respect to the Commerce Secretary's decision. And my colleague's indulgence, I just have one question about B1. Personal communication, which does not involve a transfer of anything of value, value to whom? To TikTok, to the speaker, to the listener, all of the above, any of the above? I think any of the above, but in this case, it's all of the above, Judge Millett. So the easiest example of this in the terms of service is the license that TikTok compels every user to grant to TikTok itself over any communication or any video or any other activity on the app. That is indisputably a thing of value, transferred from the user to TikTok as part of the communication or transfer of information. And there's no question there that the license is a thing of value. But TikTok has also monetized the activity of users on the app in a way that is quite different from the examples of the postal service or a telephone company. And so we think that even by that measure, it is a thing of value to everyone involved, the way that TikTok has monetized user activity in this sense. And that itself demonstrates some of the concerns that the government has identified about the sweeping collection of sensitive personal data here. Thank you. Why don't we hear from counsel for appellees? Thank you. Thank you, Your Honor. May it please the court, Beth Brinkman for the plaintiff appellees. The Commerce Department's prohibition would restrict a robust community of millions of Americans sharing personal communications and informational materials on the TikTok app. That prohibition violates Congress's explicit limitations on IEPA authority. The government's argument that the prohibition regulates a business-to-business transaction doesn't change that fact. A government prohibition can regulate more than one thing. Congress specifies here that IEPA does not authorize indirect regulation. That means the government cannot choose to restrict communication by choosing an indirect means to do so. There may be close cases, but this is not one of them. The prohibition stops U.S. users from exchanging videos, photos, art, audios, text, political messages, and it was designed to do just that. I wanted to take a moment and turn to the Walsh case that was discussed at length and what indirect regulation means. The Walsh case and analysis wholly supports the plaintiff's position here. The regulations there allowed posters to be imported. There was no stopping that. The additional point was whether or not a regulation could restrict travel to Cuba, and the court held it could be because it was only tangential to the importing of the posters. Indeed, a full examination of that opinion indicates that even all travel wasn't prevented. What was traveled was that you could not pay for it. Somebody could have even traveled to Cuba to do that if the host paid for that travel. That was not an indirect regulation import of the posters. By contrast, the example that opposing counsel spoke about, about buying posters, allowing the buying of posters, but then saying that it had to be paid for into an account that the government then blocked, that was not prohibited. That's, in fact, what existed before the 1988 amendment, and that's why this court discussed it at the Walsh case. It's exactly that type of situation which we find here. The government tried to say, oh, you know, we're not doing anything about these communications. We're just not going to let you have the app to do it. That's exactly what the indirect regulation was that the court in Walsh said was not critical. Can you repeat that sentence one more time? I want to make sure. Certainly. In the Walsh case, the court explained what was an indirect regulation that was not because here the government tries to say, oh, we're not regulating the videos or the messages, but in fact, go ahead, you know, and try to use them. You know, try and buy the posters, but your money is going to go into an account, and oops, we blocked the account. Here we'll try and use it. Oops, you know, the app isn't available. That is exactly what's happening here is indirect regulation. The idea that there could be some kind of alternative that would several things. First of all, the TikTok app cannot be replaced. There's no adequate or comparable alternative. The features on the TikTok app, there's a duet feature, a stitch feature. They're creative. They're clever. I mean, that is why it's so successful. So, there isn't some kind of adequate replacement for that. Moreover... It sounds like a complicated factual question whether they're... I'm sure TikTok is of the view that it is absolutely the best, and it's obviously incredibly popular, but it's... I didn't... For purposes of a preliminary injunction, it's a little hard to rely on that factual assertion when at the same time TikTok is saying, if we're banned, people are going to leave in droves to these other apps and will not come back. If TikTok were that special and had all these extra features, folks would come back. And so, I find it a little hard at this stage to rely on the uniqueness of TikTok. Tell me why I should. Well, we don't think you need to, Your Honor. I would say, first of all, when communities leave, it's difficult to come back, not because you're not the best product, but they've transferred all of the opportunity costs that have passed. So, I don't think that goes to anything about the quality of the uniqueness. I would also say, though, it's not in the statute. It doesn't say so long as you can do it some other way. There's nothing like that in the statute. This is about the text of 1702B, and it's not in the statute. And just to give an example, if there were a large newspaper and the government said, you know, you have a lot of editorial writers, you have a lot of subscribers, you don't need any more. We're just going to say, no more. You can keep doing what you have, but no more writers, no more subscribers. I think this unquestionably would be indirect regulation of those messages. And again, there may be line drawing, but this is not a case where that's required. But the government is saying that we can draw a line because the government is saying that people can still use TikTok and new users can still use TikTok. They just can't use it on the mobile app. And so, they're not really regulating the use of TikTok. They're regulating or the information, they're regulating just the mobile app. Your Honor, the suggestion that they're just regulating the mobile app, the just is incorrect because although they're regulating the mobile app, they're also indirectly regulating the videos, the audios on there. And if I could point the court to a couple of things, I mean, we're talking about what the agency did here. Under the Chenery Doctrine, we looked at what agency relied on. And the district court here found both the purpose and effect of this regulation was to indirectly regulate that content, those videos. And I would direct the court to a couple of pages. It's throughout the Commerce Department's memorandum about what they are regulating here. But there's one on page 323 of the Joint Appendix. This is where, under a section called vulnerability, and the Commerce Department is talking about the vulnerability they perceive and there are eight listed categories. And I just want to focus on number three. This is a quote. They're talking about what's collected and what poses a vulnerability. Quote, user generated content, including comments, photographs, videos, etc. That is what's being regulated here. And again, back on page 332 of the Joint Appendix. The Commerce Department talks about preventing collection and aggregation of data, also about its transmission. That is what is being regulated, what it was intended to and what it does. Pardon me? Paragraph on 332. On 332, it's the second full paragraph, Your Honor, belonging to the below prohibition. It talks about denying access, reducing functionality, and then it goes on. And it talks with the objective, with the objective of preventing collection, transmission, and aggregation. And again, back on page 323, Your Honor, it's in the first full paragraph under the heading vulnerability. And the subheading, there are eight lists there. Three, user generated content, including comments, photographs, videos, and virtual items. If somebody opens a TikTok account on their web browser instead of on, I guess, the mobile app, which of these eight categories of information would no longer be implicated? If we simply want to distinguish mobile app and web browser, I would have thought almost all of this would be the same. Yeah, I don't know what they're distinguishing is, to be quite honest, Your Honor. I don't. Certainly, user, number three, when you're looking at the user generated content, I don't see how there would be any distinction, including comments, photographs, videos. I've seen registration and profile information, payment information. So much of it. Phone and social network contacts. I assume, would those still be available or not? I rarely have to look, Your Honor, but I'm sure a vast majority of it would be. The government has made no attempt to distinguish that in the record. Indeed, again, because we're looking at agency action under the Chenery Doctrine, we're not looking to what the government may be theorizing in a brief, but what the agency actually did here. Do you challenge the finding by the government that the collection of this sort of data by a foreign power presents a national security, a valid national security concern? This requires no second guessing of a national security determination here for several reasons, Your Honor. Judge Nichols looked directly at that and indicated this was a question of statutory construction, not second guessing that. He also then also looked at, on its face, at the Commerce Department's rationale and pointed out that what the Commerce Department speaks about is the country of China, and then says, could, possibly, maybe at some point in the future, there might be something not talking about the plaintiff. That's right on its face. Also, that kind of basis in the record, I would say, also, we have other challenges remaining in this case, and it relies on very inadequate and outdated information. That is part of our due process and APA claim. I would also say the timing of the government's action itself undermines, on its face, again, the national security urgency that would, you know, at all be affected by this preliminary injunction, and we go through in our papers, kind of, the delay over periods of times of issuing these. I would also say that, again, on its face, this prohibition doesn't allow security updates, which is just counterfactual to the claim that they state, again, just on its face. And the last thing I would say, Your Honor, again, we do not at all are asking or believe the court needs to address that, but just to give you the full flavor of the case, there is a claim having to do with other arguments and claims haven't been decided yet, having to do with pretextual background to this, because it wanted a rose, having to do with the campaign, that type of thing. So, again, for purpose of this preliminary injunction, Judge Nichols looked at this issue. We wholeheartedly agree with him. It is not requiring the court to second guess at all. What if it were undisputable that an app controlled by a foreign government could be used, if downloaded, could be used by the foreign government as a gateway to be able to hack into email systems and other things of that nature? And for that reason, the President banned the app. You're saying that because of the way that Congress has drawn this statute, that would not be a permissible regulation? What we're saying, Your Honor, is something different from that. That suggests there's some regulatory void, if this is our interpretation of IEPA. I mean, the first thing I would say is in the hypothetical that the President ordered that, well, this is a weird type if he uses the IEPA authority to try and do that. The government has plenty of other tools at its disposal. And this is an extraordinary exercise of IEPA authority. The government has never found it necessary to use IEPA for this means. And in fact, there's a declaration by Professor Tyler in support of the preliminary injunction that really puts in context the IEPA authority. But in addition to that, Your Honor, if you look at the text of the statute that Congress enacted under B-3, it specifically references, for example, Chapter 37 of Title 18. That is not, regulation of that is okay. It's not prohibited under the B-3 limitation. That has to do with classified information, information about military installations. Congress also referred in there to export controls, also that are not excluded from regulation under B-3. So Congress went through very carefully and said what B-3 applies to and that's what it did. I'd also say the Walsh case, certainly if there were concerns about data security, I can imagine a regulation that addressed data security in a way that did not have an effect on the transmission of the communications and the informational material. But if that regulation does what this does and, you know, basically stops the functioning of the app, that is not permissible under IEPA. Again, there are other tools, including CPS that Congress has to look at transactions and to find mitigations for that. But if it's a security issue and they're looking at the mitigation, that's what you would look at. And again, I guess ultimately, Your Honor, if for some reason all of the tools in the government's toolbox could not address a national security concern, there is Congress, of course, to take action. What we do know is that Congress, not once but twice, amended the statute to reinforce these limitations in IEPA authority and said you can't use this economic kind of sanction to shut down this type of personal communication or informational material. All right, but what if, to follow up on this hypothetical, if you had an app that was actually 100% owned by hostile foreign government acts, very hostile foreign government acts, and they come up with this incredibly popular application and every time it's downloaded, it puts a virus in to the phones and reachable to anybody in your contacts. And it can be released uncontrolled. So as it turns out, when it's first downloaded, we don't know. And then it's released. And it starts wreaking havoc across the United States at a time of acute tension with hostile foreign government. And it's a communication app just like this one. And it's really popular and it's really unique. Are you saying that what the statute says is that the government could not ban people from continuing to download this virus spreading, computer virus spreading application? What Congress has said is that the IEPA authority can't be used for that. Another tool that the government has is to ban certainly all of Title 18 and all kinds of criminal prohibitions. Stop teenagers from downloading this thing by 400,000 people. I have my memory right, 100,000 people a day. Is that what they're saying? If there was a regulation that was aimed at the security concerns that met these limitations, that would not be indirect regulation. Then stop downloading this. It is destroying our communications networks, our computer and mobile phone networks. Stop downloading it. Really, they have to wait for Congress to come in and ask something? They can prosecute somebody if they can find somebody within their jurisdictional reach. But it seems to me that there are real consequences to interpreting this language as you're proposing to national security. It just strikes me that what they would be getting there is clearly not the communications. It is the technology that comes with the technology when it's downloaded, this virus. I don't care what messages you're sending. We cannot have this technology coming into our systems here. It wouldn't have any of the concerns you have. It clearly would not be a regulation of communications. They wouldn't have any language you've been pointing to. That seems to me clearly allowed. That's not a regulation. Your Honor, it's clearly not this case, obviously. I will talk about it. But again, as I said earlier, there might be cases where there's line drawing, where it has such a tangential impact under Walsh. Walsh is clearly downloading this communications app, but they don't not communications. They've just got to stop the technology. How textually can you tell me you can offer? I know you say that isn't this case, and I'm not suggesting that there's any virus detector or anything like that, to be clear. What definition, what term would you use in here to say ruling for you in this case would not require ruling for you in the other cases? Is it the indirect regulation? I would say the ruling in that case would have to do with the fact that there's limitations on B3. It talks about Chapter 37 of Title 18. It talks about various trade regulations. There's the CFIUS authority. There's other kinds of criminal prohibitions. We talk about carriers that have foreign investment license. The FCC has authority. There's a multitude of other tools that the federal government has. AEPA has not ever been used, nor need it be, to do that. There are other tools, and there are limitations within the B3. So your view is there's nothing we can do to interpret B3 that would say government can stop under AEPA my virus hypothetical, if we rule for you in this case. But your argument is there's authorities elsewhere. There are authorities elsewhere, Your Honor. We think that B3 can be interpreted to allow them to ban that hypothetical, that software download, if we rule for you in this case. We think that when you're looking at that type of situation, it's such a far cry from this situation where, and I just want to And that could be a different analysis, Your Honor, is what I'm saying is that the purpose there was for this overwhelming national security thing. That would be very different from here. So that might be another distinction. But it lets me look at, have a purpose-driven analysis in B3. Judge Nichols believed that the idea of regulate and the objective of what is being regulated goes to the purpose. And that's why he so closely looked at the Commerce Department memo and looked at how its aim is to shut down these communications, these videos, these messages. So that would be another construction that when the date came Do you agree with that? If in this case, it were crystal clear that they were just trying to stop these downloads. They really were. They had all the affidavits, all the fact-finding. That was their clear purpose. Change the record any way you want so that 100% of the evidence of purpose is simply to prevent the business-to-business sales that allow this download. Then that subjective purpose would prevail and it would be okay, even if, as it turns out, it's stopping an awful lot of speech. We don't think there's a purpose requirement. We argued that to Judge Nichols. But what I'm suggesting to you, Your Honor, in your hypothetical situation. So for this case today, it doesn't matter whether there is because, as Judge Nichols found, it's the purpose and effect to directly regulate this, at a minimum, indirectly regulate the videos, the messages, etc. So it doesn't need to resolve for this case, nor does the situation, the other hypothetical need to be resolved for this case. But taking, Your Honor, at the question of what is the government to do, we would say three things. There are a lot of alternatives. IEFA has never been used. Even within IEFA, the B3 itself, Congress is very clear about classified information, military installations. And third, there is Judge Nichols' approach that would say purpose would address your situation also, that the purpose there would not be to regulate the content or the video. So those are three answers I would propose to your hypothetical, none of which are necessary in this case, nor need be reached in this case. And we agree, Your Honor, that purpose is not in the statute, but we clearly need it here as the district court found. How do you draw the line on distinguishing between indirect regulation, which isn't allowed, and some sort of permissible burden, which is? We would look to the Walsh case, Your Honor. We think that the language there of tangential effect is very useful. It really goes to the thrust of what indirect regulation means. You are trying to stop the import of something or stop the transmission of messages, and you say, I'm just going to shut down the way they get paid or the way they use the app. That is indirect regulation. But if you're doing something else and all those messages are still flowing, those posters are still being imported, but there's this other thing that you can't use U.S. hard currency to travel to Cuba where you want to get your posters from. Well, that pretty much has a tangential effect, and the court pointed out you could get your Cuba host even to have you come there. So could the president here have said, unless and until, you know, TikTok needs to change its license and disable certain features in the software that we were giving them, you know, 30 days to do that, and if they don't, then the app is banned from further downloads. Could the president do that under AIPA? That gets much closer to the type of regulation I talked about that was, you know, we could envision that focused on data security that speaks to that and that would not affect the ability to transmit communications. But I would say, Your Honor, even more fundamentally, this goes back to part of my answer to Judge Millett, too, about these other tools. CISIUS, which is the Committee on Foreign Investment in the United States, has that type of authority to mitigate national security concerns having to do with various transactions. There currently are ongoing discussions under that very authority. The president issued an order under CISIUS about a week after this order, and those negotiations and discussions are still going on, and that's an appropriate place for that. We disagree with the breadth of the government's actions there and have filed a petition for review of that agency action in order to preserve our rights while these discussions continue, but that is exactly what, again, Congress created to address those very concerns. And I can't say enough, Your Honor, how important it is that we look to how Congress has looked at these various issues. But why isn't it relevant to us? I mean, when we interpret a statute, we don't normally look to see, you know, well, if we interpret it this way, we shouldn't be worried because all of these other you know, these other situations. I mean, we need to look at the text of this statute in the C, given the concern that Congress had, which is to give the president the ability to act unilaterally once the proper declarations and procedural requirements are made to protect national security. And if you have if you have a hypothetical case where there's no question there's a serious national security risk that's posed by software that's downloaded on mobile phones, it seems to me that your interpretation that you would ask us to adopt doesn't allow the president to use this authority to act. I mean, even in the hypo that I just posed, that if the president says, look, change these particular things about the application and do it by this date, or I'm going to block the application, you don't seem to be willing to admit that that is permissible because of B3. Oh, let me be clear, Your Honor. I did not need to say that was not permissible. I think it's more appropriate under CFIUS because they've got this whole regulatory scheme set up for mitigation and all of that in a process. But here, Your Honor, a regulation, if the Commerce Department had done that, again, we have to look at what the Commerce Department did here. They didn't do that at all. But the Commerce Department were looking at that targeted national security concern, and they have a record to support it. And again, I have to say, in that situation, they would have had to give us notice and comment to respond. We didn't get notice and comment to respond. So we couldn't explain to them all the security measures that we do have in place. There's a declaration below that explains that. I mean, that's not all relevant to the statute thing, but I'm just giving you the context. If that had played out, it would have played out very, very differently. And that well might be something that did not indirectly regulate communications because there could be measures taken that didn't affect the communications. So I just want to be clear about that. I'm sorry I was unclear before I was proud. Jumping too quickly to the other method that's allowed there. So that is an approach. But I would also say it's not our interpretation. This is the words of Congress, and this is an A3 of our process. They went through whatever process you want, and they gave you that two months or one month. And then we are banning download of the app. At that point, banning download of the app would not be impermissible? If it banned the app, Your Honor, it would not come to that because there are all of these data security provisions that can be taken. In fact, TikTok takes them. That's what the declaration indicates. After that one month period of intense negotiations, the government and the company are not in agreement. And so the ban comes into effect. It's not because they didn't try, and maybe they did do some adjustments here and there, but the ban comes into effect, and AIPA is the authority for the ban. Well, CFIUS is the authority. CFIUS cross-references AIPA. So I take it you're, Judge Wilkins, for example, sometimes you do look at more than one statute because they cross-reference each other, and it explains if AIPA doesn't satisfy, then you can do this under CFIUS. So I think you'd have to look at the interaction of those two. And in fact, the Commerce Department regulation here, prohibition does look at the interaction between the two because it even acknowledges that the prohibitions will not apply to activities that need to be taken to address the CFIUS issue. So I do think there's interaction between those two authorities. But I do also have to... Does that mean it could be banned? They just cited the wrong statute this time? No, Your Honor. It's a different process, and the CFIUS has the mitigation authority. But what I'm saying under AIPA, if there is a regulation that is addressing data security that does not go to and affect the actual transmission of the messages, whether it's encryption, prohibiting malware, there are lots of things that could come under that, that would be different. That's not what the Commerce Department did here. I understood, and maybe Ms. Wilkins, correct me if I'm wrong. His hypothetical was you have a time period, and if you haven't worked everything out, a ban on download goes into effect. And what I'm asking you is, would that be banned when it goes into effect? The process just lead to resolution. Would that be permissible? You're saying that would be permissible under CFIUS authority, but not under AIPA or under... That would not be allowed. An ultimate ban that shut down the informational materials, the transmission of informational materials, photographs, et cetera, within B3 would be an indirect regulation of those informational materials that would not be allowed. But under the CFIUS authority, there are other authorities that are not limited. CFIUS is not limited by B3. This is a statutory textual... CFIUS would ban after 30 days. CFIUS could impose the same ban that was imposed here. I can't speak that broadly, Your Honor. That's why I'm hesitating. They're ongoing negotiations, and ban is a very generic word. We take issue with the... ...cannot be downloaded by new users and cannot be updated by existing users. That's what I mean by ban. Right. And what I'm saying in the CFIUS context, it has to do with covered transactions and various uses of its authority that are in ongoing discussions now. Hypothetically, I'm sure there are situations where that would be possible. I just can't speak to this particular situation because I'm not privy to the CFIUS negotiations. I'm just the litigator here. But I want to bring it back to the text of the... I'm asking the question just because if the argument is, if we have a real crisis like Judge Wilkins hypothesized or my virus one, it's a real crisis, and it really is focused on technology. That's the real problem. And I thought your argument was, here's the process for dealing with that. But if it doesn't actually allow them to stop the hemorrhaging, to stop the downloading, then it seems like it's not... Is there some other authority that would let them go stop the downloading of this virus-stealing technology? And we'll sort it out later, but let the government go fast and stop the downloading. Why don't we... Go ahead. Thank you, Your Honor. The government has many authorities, Your Honor. I can't figure and catalog all of them, but there certainly are export controls, import controls that are allowed. There are anything that would be tangential. But I would also say, Your Honor, again, if that date comes and that issue is presented, it will be such a different situation than this. I just want to say, again, it goes to this question, for example, of purpose that it's clear that the purpose and effect here is to stop the transmissions of these communications. But he suggests, and I'm suggesting to you, could fit your hypothetical. If there was some purpose under his approach that had nothing to do with the actual communications, that may be something. That just is not something that the court needs to grapple with today, and I think there are a lot of different analyses. The interaction with other statutes, the interaction with other national security authorities of the government, and the idea of a situation that's different from this, where the purpose is totally different than what the purpose was here. So I would say all of those, I think, should give comfort and address the situation. There are tools for courts and the executive and the government to look to. And of course, there also is the authority of Congress. But I take your point that you're looking for something emergency that could be done directly, and I would suggest that other tools, the purpose, all of those things are a way that could arise in another situation that isn't present in this case. And that is what we're looking at here today, Your Honor. It's a question of statutory interpretation. What Congress said and expressly said, the authority granted to the President by this section does not include the authority to regulate or prohibit directly or indirectly in that it has the personal communications and the informational materials. And the informational materials is quite broad, commercial or not, regardless of format or medium, twice amended in the Berman Amendment, and then again in 1994, the Free Trade and Ideas, to ensure the robust international exchange of ideas. And that is what Congress wrote. There are other authorities, there are interactions between these statutes. And indeed, there's Judge Nichols' approach, particularly in his more recent opinion last week, he issued another opinion on the case and really went through and analyzed his approach, I think, to purpose, which might address your issue. Again, you know, we don't see that in the statute, but it just doesn't matter here because it's so clear and the record is so clear from the Commerce Department's memo about the purpose and effect of the prohibition issue here. All right, why don't we hear from counsel for appellate? Thank you, Judge Rogers. I want to make a couple points in just to address what my opposing counsel was discussing. So first of all, the statutory language here protects the rights of Americans to a certain activity, like importing informational materials. It doesn't protect the rights of businesses or foreign governments. And that's important because Walsh emphasized the need for line drawing. There was a discussion about line drawing, and it's indisputable that Walsh emphasized, recognized that there's a need to balance the two congressional concerns, as the court said there on page 1233, recognizing Congress's intent to give the president wide powers under AIPA to address serious national security threats. But just so we're clear, you have not argued that there are not other statutes, other procedures, other ways in which the president would have authority to ban downloading an app. Actually, Judge Rogers, that we haven't addressed that question, nor have plaintiffs in the briefing in this case, and I think it's important. But it's obviously something of concern to us. Yes, and I think that concern is serious because I don't think anyone has identified a similar emergency authority to address the kind of imminent threats to national security that Judge Millett and Judge Wilkins in their hypothetical examples posed. AIPA is designed specifically to address those kinds of threats. And the fact that a particular business or a particular foreign government seeks to hide a national security threat in a business or an activity that allows Americans to engage in personal communications or exchange of informational materials does not insulate that business from regulation of the threat it poses to national security under AIPA. The other point I want to emphasize is that the plaintiffs acknowledge there's a national security concern here, but they nevertheless double down on this interpretation that AIPA doesn't reach this kind of national security threat if there's any implication, any effect on communication or informational exchange. If this were a rideshare app or a video game app collecting the same sensitive personal information, there's no doubt AIPA could regulate it. It can't be insulated just by pointing to the fact that Congress intended. And finally, I want to emphasize that Walsh's reference to the tangential nature of the travel at issue there was not the court's articulation of the standard with the meaning of indirectly regulate or prohibit. It was instead an example of the court's Chevron deference to the Treasury Department's own rationale for why it retained the travel regulation. I know we only have the first prohibition before us, but on this theory about use of the web browser, with the fifth prohibition, when it says no utilization of TikTok's mobile applications constituent code functions or services, the functioning of software or services within the United States, would that ban use of TikTok through the web browser? Your Honor, we don't know the answer to that yet, but I think that it might not. And the reason is that the language of the fifth prohibition, again, like all of the prohibitions in the executive order, reference the TikTok mobile application. That is the particular threat identified. I'm trying to figure out what constituent code functions or services are and whether those are actually in any way distinct from using it through the web browser. Typically you use the web browser on your mobile phone. Yes, Your Honor, but it wouldn't be using the mobile app. So again, these are questions that probably remain to be explored in terms of... Sorry, Your Honor? We're not at all clear about this web browser alternative. Correct. And I'll just point out that the only reason I mentioned it is because this prohibition at issue here is limited solely to the mobile app, and it's limited solely to its availability on app stores. That is a targeted regulation designed to address the specific threat identified. It is not the kind of in reality ban of importation or exportation of informational materials or personal communications. That is the meaningful difference that I think is relevant, not whether web browsers are different in some other way, Your Honor. And that, like the other questions that plaintiff has raised in their complaints, remain to be resolved as the case proceeds on the merits and district court. This question before the court now is whether the preliminary injunction can be upheld solely on the basis that the district court articulated that it is an indirect regulation of Americans' protected activity. That's not what the statutory language means as the court recognized in Walsh. And we think that disposes of this appeal, Your Honor. Can I ask you about timing as well? This is an expedited appeal, but my recollection is correct. The government never saw the stay of the preliminary injunction and now has published in the Federal Register a statement that in light of this injunction, I think, I can't remember if that was after or before the December 7th injunction, but they're not enforcing it. And my understanding is that the November 12th deadline went by, and those prohibitions are not being, there's no one, whoops, it wasn't until December 7th. The November 12th deadline came and went, and at least until December 7th, there was no injunction, yet the government was just not enforcing. Oh, I'm sorry, Your Honor. No, no. That was my understanding. Tell me how I'm wrong. So there wasn't an injunction, Your Honor. It was entered by the district court in Pennsylvania in the Marland case, which was brought by three users of TikTok, and it enjoined all five prohibitions. And you're correct, Judge Nolette, that the government did not seek a stay in this case of the injunction of the first prohibition, and instead, we sought expedited resolution that we'd urge this court to rule expeditiously as well in order to address and protect. Have you sought a stay in the Pennsylvania case? We have not, Your Honor. We also sought, and the court granted, expedited briefing and argument of the appeal. The briefing is the court has set arguments for February, I believe, 14th and 15th. It's just a little bit unusual to me in a case of national security, one, not to have any declarations here, even if under seal by national security officials, telling us the urgency of these actions, and then in particular, not to have the government seeking a stay. So I'm just trying to get a measure here from the government. So we've got a third circuit. Is that what you said? Yes, Your Honor. Okay. So you're not even expecting decisions until later on in February, maybe in the past? Well, we've asked this court, and we've asked the Third Circuit as well to rule expeditiously. This case... If there's another injunction in effect, and that's Third Circuit decision, again, if you're given argument in... Sorry, was that February 14th? Am I remembering that? I don't remember the day in February, Your Honor. It is in February is all I can recall. So if I may address your question, Judge Millett, this case is the furthest along of the appeals, and we're asking you to rule expeditiously in light of the national security concerns identified. If this court rules in our favor, we could seek additional relief in other courts, and that could be a basis for doing so. We thought it was better not to impose a burden, both on the court and on the parties in this case, to duplicatively brief both a stay and expedited briefing. And we thought that it was essential to allow the court to consider the merits questions posed, the likelihood of success of the merits, that is, posed by this case. And so we sought expedited briefing instead of a stay, and didn't seek a stay, I should say. There's nothing untoward about that. Nothing undermines the national security rationale here. And indeed, as I emphasized in this argument, opposing counsel acknowledged the national security threat is legitimate, and there's no basis to second guess the president's determination on that question. Is there any timetable for the committee to act? Uh, you're referring the committee, uh, the CFIUS proceeding, Your Honor, and I am not familiar with the details of that. My understanding is that that's a separate track, but I'll also point out that the plaintiffs have filed a separate petition for review in this court, which will proceed on its own track concerning that statutory process. All right. We think it's not relevant, however, to the interpretation of the exception. All right. Thank you.
judges: Rogers, Millett, Wilkins